UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ASEM ELDAGHAR,

                    Plaintiff,

                                           02 Civ. 9151 (KMW)(HBP)
           -against-                        OPINION AND ORDER


CITY OF NEW YORK DEPARTMENT OF
CITYWIDE ADMINISTRATIVE SERVICES,

                    Defendant.
---------------------------------x

KIMBA M. WOOD, U.S.D.J.:

     Plaintiff Asem Eldaghar ("Plaintiff") asserts claims of (1)

discrimination based on national origin in violation of Title VII

of the Civil Rights Act of 1964 ("Title VII"), as amended, 42

U.S.C. §§ 2000e et seq., and age in violation of the Age

Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29

U.S.C. §§ 621 et seq.; (2) retaliation in violation of Title VII

and the ADEA; and (3) hostile work environment in violation of

Title VII and the ADEA.   Defendant City of New York Department

of Citywide Administrative Services ("Defendant" or "DCAS") now

moves for summary judgment on all of Plaintiff's claims.   For the

reasons stated below, Defendant's motion is granted in part and

denied in part.

I.   **BACKGROUND**

     Unless otherwise noted, the following facts are undisputed

and are derived from the parties' Local Civil Rule 56.1

Statements.   All inferences have been drawn in favor of

Plaintiff.

**A.  PARTIES**

Defendant is an administrative agency of the New York City government.  Among other responsibilities, DCAS supports other New York City government agencies, manages public buildings, and engages in land use planning.

Plaintiff was employed on a probationary basis as a City Planner in the DCAS Division of Real Estate Services ("DRES") from February 5, 2001 until his termination on August 17, 2001. Plaintiff is of Egyptian national origin and he was 44 years old during his DCAS employment.  (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 2; D.E. 50.)

**B.  HIRING**

Plaintiff earned a Bachelor's Degree in Architecture and a Master's Degree in Urban Planning.  (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶¶ 3-4.)  He took and passed the civil service examination for the position of City Planner.  (See id. ¶ 7.) Plaintiff underwent (1) a September 2000 preliminary interview with Kristi Knecht ("Knecht"), DRES Director of Land Use Planning, and (2) a January 2001 interview with Knecht; Randal Fong ("Fong"), DCAS Assistant Commissioner; and Helen John ("John"), DRES Director of Personnel and EEO Counselor.  (See id. ¶¶ 8-9.)  Knecht and Fong decided to hire Plaintiff immediately following the January 2001 interview, and Plaintiff commenced his probationary employment with DCAS on February 5,

2001.  (See id. ¶¶ 10-12.)

### C.   ACTS OF DISCRIMINATION

Plaintiff alleges that during the course of his employment, he suffered numerous instances of discrimination, including but not limited to, (1) oral comments about his national origin and age, (2) "unwarranted unsatisfactory ratings in his probationary reports," and (3) deviations from Defendant's policies and procedures.  (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 20.)

#### 1.   Oral Comments

Plaintiff alleges that his supervisors made the following comments about his age and national origin: First, shortly after Plaintiff completed a mandatory orientation program, Knecht, Plaintiff's direct supervisor, allegedly commented that it was time for Plaintiff to "jump on the plate and . . . be part of the team." (Pl.'s Resp. to Def.'s 56.1 Stmt. ¶¶ 17-18.)  Second, Plaintiff alleges that shortly after this comment, Knecht and Fong stated to Plaintiff that "younger people are better than older people at using computers." (Id. ¶ 23.)  Third, Knecht allegedly answered a question posed by Plaintiff with the dismissive response that "even Matthew knows this," a reference to a college student intern then employed by DCAS.  (Id.) Fourth, Knecht asked him about historical sites to visit in Egypt.  (See Kousoulas Decl. Eldaghar Aff. ¶ 10, D.E. 49.) Fifth, in or about July 2001, Fong overheard Plaintiff speaking with two individuals in Arabic, and allegedly asked what language

Plaintiff was speaking and whether the other individuals were also from Egypt. (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 24.) Sixth, Plaintiff alleges that Knecht yelled at him: "Don't you people understand? How many times should I explain to you?" (Id. ¶ 33.)

### 2.    Unwarranted Unsatisfactory Ratings

Plaintiff argues that the criticism contained in six probationary reports and other memoranda was unwarranted.[1] These performance reviews thoroughly document Defendant's dissatisfaction with Plaintiff's job performance. However, Plaintiff disputes the accuracy of some of the information contained in the probationary reports and other memoranda. (See Pl.'s Mem. 6-9, D.E. 48.) Plaintiff thus argues that the criticism contained therein was unwarranted. (Id.)

### 3.    Deviations from DCAS Policy

Plaintiff argues that DCAS personnel deviated from DCAS policy both before and after his termination. He alleges that (1) he never received "a formal warning letter" that his employment could be terminated (Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 28); (2) he did not receive the negative probationary reports dated July 2, 2001 and August 2, 2001 until after he filed a

---

[1] Defendant developed six probationary reports and other memoranda evaluating Plaintiff's job performance. (See Soni Decl. Exs. L, M, N, O, Q, R, S, T, U, V, Y, D.E. 33.) The probationary reports dated March 5, 2001; April 5, 2001; and May 2, 2001 rate Plaintiff's overall job performance as satisfactory. (See id. Exs. L, M, N.) The probationary reports dated June 2, 2001; July 2, 2001; and August 2, 2001 rate Plaintiff's overall job performance as unsatisfactory. (See id. Exs. O, V, Y.)

discrimination complaint with the New York State Division of Human Rights ("SDHR") (see id. ¶¶ 49, 50, 52; Pl.'s 56.1 Counterstmt. ¶¶ 64, 66-68); and (3) Plaintiff's requests for restoration to the civil service list for City Planners were denied by the DCAS Director of Personnel, and not, as required, by the Deputy Commissioner for Citywide Personnel Services (see Pl.'s 56.1 Counterstmt. ¶¶ 97-98).[2]

### D. TERMINATION AND SUBSEQUENT EVENTS

On August 17, 2001, DCAS terminated Plaintiff's probationary employment. (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 60.)  Knecht testified at her deposition that in or about May or June 2002, DCAS hired Matthew Berk ("Berk") as a replacement for Plaintiff. (See Soni Decl. Ex. J 57; see also Kousoulas Decl. Ex. E 7, 32.)

Following his termination, Plaintiff requested restoration to the civil service list for City Planners on two occasions. Both restoration requests were denied.  (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶¶ 62, 64-65; Soni Decl. Compl. Ex. I, Exs. CC & DD.)

Following his termination, Plaintiff also filed a SDHR complaint.  (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 76; Soni Decl. John Aff. ¶ 13, Exs. KK & LL.)  SDHR found "insufficient evidence to support [Plaintiff's] allegations of discrimination

---

[2] DCAS and other New York City government agencies appoint employees from the civil service list.  (See Kousoulas Decl. Eldaghar Aff. Ex. 7.)  Individuals must take a civil service examination for a particular position to gain a place on the relevant civil service list.  (See id. ¶ 5.)

based on age and national origin." (Soni Decl. Compl. Ex. F 1;
see also Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 79.) Plaintiff
sought review of the SDHR determination with the United States
Equal Employment Opportunity Commission ("EEOC"). (See Pl.'s
Resp. to Def.'s 56.1 Stmt. ¶ 80.) The EEOC adopted the findings
of the SDHR, dismissed Plaintiff's charge, and issued a right to
sue letter. (See Soni Decl. Compl. Ex. H.)

On November 15, 2002, Plaintiff timely commenced this
action. Defendant subsequently moved for summary judgment.
Plaintiff opposes the summary judgment motion.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is properly granted where "the pleadings,
the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to a judgment as a matter of
law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S.
317, 322-23 (1986); Guilbert v. Gardner, 480 F.3d 140, 145 (2d
Cir. 2007). The substantive law governing a case will determine
which facts are material. See Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986). An issue is genuine "if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." Id.; Mitchell v. Shane, 350 F.3d 39, 47 (2d
Cir. 2003).

The burden of demonstrating the absence of any genuine issue

of material fact rests with the moving party.  See Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002)(citing Celotex Corp., 477 U.S. at 323).  Once a motion for summary judgment is made and supported, "the non-moving party must set forth specific facts showing that there is a genuine issue for trial."  Id. (internal quotation marks and citation omitted); Fed. R. Civ. P. 56(e)(2).  All inferences must be drawn in favor of the non-moving party.  See Liberty Lobby, 477 U.S. at 255.

"[S]ummary judgment is ordinarily inappropriate" in an employment discrimination case "where intent and state of mind are in dispute."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  To grant summary judgment in an employment discrimination case, "[t]here must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly titled in one direction that any contrary finding would constitute clear error."  Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).

### B.   DISCRIMINATION CLAIMS

Plaintiff claims national origin and age discrimination based on (1) his termination; (2) Defendant's denial of an opportunity to transfer to a different DCAS division in lieu of termination (the "transfer denial"); (3) Defendant's refusals to restore Plaintiff's name to the civil service list for City Planners (the "restoration refusals"); and (4) alleged disparate scrutiny of Plaintiff's work performance by his supervisors (the

"disparate scrutiny"). ( See Pl.'s Mem. 10-11.)

The Court grants summary judgment to Defendant on the discrimination claims based on the restoration refusals and the disparate scrutiny. The Court denies summary judgment on the discrimination claims based on Plaintiff's termination and the transfer denial.

### 1. Discrimination Framework

Title VII and the ADEA protect against discrimination in the employment context. See 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623 (a)(1). Courts analyze Title VII and ADEA claims of discrimination under the "burden shifting framework" set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), and its progeny. See Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000).

> Under that framework, [1] a plaintiff must satisfy the minimal burden of making out a prima facie case of discrimination; [2] the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and [3] the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff.

Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 91 (2d Cir. 2001) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

### 2. Prima Facie Case

To establish a prima facie case of national origin or age discrimination, a plaintiff must show that: (1) he belonged to a

protected class or age group; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. See Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003) (internal quotation marks and citation omitted).

### a. Member of a Protected Class and Age Group

It is undisputed that Plaintiff is of Egyptian national origin and therefore is a member of a protected class. It is further undisputed that Plaintiff was forty-four years old in 2001, and therefore was within the protected age group. See Tarshis, 211 F.3d at 35 ("The ADEA prohibits discrimination on the basis of age against an individual aged 40 or older."). Accordingly, the Court finds that Plaintiff satisfies the first element of his prima facie case with respect to all of the discrimination claims.

### b. Qualified for the Position

Plaintiff held a Bachelor's Degree in Architecture and a Master's Degree in Urban Planning, took and passed the civil service examination for the position of City Planner, and underwent a preliminary interview in September 2000 followed by another interview in January 2001. To be qualified, "all that is required is that the plaintiff establish basic eligibility for the position at issue." Slattery, 248 F.3d at 92; see also Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991)

(a plaintiff must demonstrate only "that she possesses the basic skills necessary for performance of the job") (internal quotation marks and citations omitted).[3]  Accordingly, the Court finds that Plaintiff satisfies the second element of his <u>prima facie</u> case with respect to all of the discrimination claims.  <u>See</u> <u>Slattery</u>, 248 F.3d at 92 ("[W]here discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw.").

### c.  Adverse Employment Actions

Plaintiff argues that the following actions constitute adverse employment actions: (1) his termination; (2) the transfer denial; (3) the restoration refusals; and (4) the disparate scrutiny.[4]  (<u>See</u> Pl.'s Mem. 10-11.)  Defendant concedes that

---

[3] Defendant contends that in order to satisfy the second element of a <u>prima facie</u> case under Title VII and the ADEA, Plaintiff must establish that he satisfactorily performed his employment responsibilities.  (<u>See</u> Def.'s Mem. 3-8, D.E. 47.)  In <u>Slattery</u>, the Second Circuit rejected this argument, holding "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." 248 F.3d at 92.

[4] Defendant argues that the Court should not consider evidence of the discrimination claim based on the transfer denial because Plaintiff did not raise this matter in his deposition.  (<u>See</u> Def.'s Mem. 10 n.7.)  However, at the time of his deposition, Plaintiff was proceeding <u>pro se</u>.  The Court thus liberally construes the discrimination claims raised at Plaintiff's deposition.  <u>Cf.</u> <u>Pabon v. Wright</u>, 459 F.3d 241, 248 (2d Cir. 2006) (holding that complaints filed by <u>pro se</u> litigants shall be construed to "raise the strongest arguments that they suggest").  At his deposition, Plaintiff testified to his awareness that Kevin Lorme ("Lorme"), originally hired as a probationary Associate City Planner, was allowed to transfer to another DCAS division in lieu of termination.  (<u>See</u> Soni Decl. Ex. B 135.)  Furthermore, Plaintiff raised the discrimination claim based on the transfer denial in his request for the EEOC to review the SDHR determination.  (<u>See</u> Soni Decl. Compl. Ex. G 3.)  The Court thus finds

termination constitutes an adverse employment action, but contests the remaining actions. (<u>See</u> Def.'s Mem. 10-13.)

An adverse employment action must negatively affect an individual's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2. However, an adverse employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." <u>Terry</u>, 336 F.3d at 138 (internal quotation marks and citation omitted). Examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices . . . unique to a particular situation." <u>Id.</u> (internal quotation marks and citations omitted). "Generally, the ADEA, like Title VII, protects individuals from actions injurious to <u>current</u> employment or the ability to <u>secure future</u> employment." <u>Wanamaker v. Columbian Rope Co.</u>, 108 F.3d 462, 466 (2d Cir. 1997) (emphasis in original). The Court thus finds that the transfer denial and the restoration refusals constitute adverse employment actions.

However, the Court finds that the disparate scrutiny does not constitute an adverse employment action. Plaintiff alleges that "he was subjected to greater scrutiny and different

_____

that it may consider evidence of the discrimination claim based on the transfer denial.

11

evaluation standards than his younger, American colleagues."
(Pl.'s Mem. 11.)   Such disparate scrutiny, by itself, does not
constitute an adverse employment action because it did not affect
the compensation, terms, conditions or privileges of Plaintiff's
employment.   However, the Court will consider the disparate
scrutiny and Plaintiff's other allegations of disparate treatment
in the context of Plaintiff's remaining discrimination claims.
Cf. Cross v. N.Y. City Transit Auth., 417 F.3d 241, 250 (2d Cir.
2005) (finding that a training disparity may establish an
inference of discriminatory intent driving the plaintiff's
demotion); Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d
Cir. 2003) (holding that "[a] showing of disparate treatment . .
. is a recognized method of raising an inference of
discrimination for purposes of making out a prima facie case").

Accordingly, the Court finds that Plaintiff satisfies the
third element of his prima facie case with respect to (1) his
termination, (2) the transfer denial, and (3) the restoration
refusals, but not the disparate scrutiny.

> **d.   Circumstances Giving Rise to an Inference of
> Discrimination**

The Court finds that Plaintiff's termination and the
transfer denial, but not the restoration refusals, occurred under
circumstances giving rise to an inference of discrimination.
Therefore, Plaintiff satisfies the fourth element of his prima
facie case with respect to these two discrimination claims.

### i.    Plaintiff's Termination

The Court finds that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination. "The fourth element of the prima facie case may be satisfied by a showing that the plaintiff's position remained open after he was discharged, or that he was replaced by someone outside his protected class." Tarshis, 211 F.3d at 36. In May or June 2002, Defendant hired Berk as a replacement for Plaintiff. (See Soni Decl. Exs. J 57; Kousoulas Decl. Ex. E 7, 32). Berk is of American national origin and was twenty-two years old at the time of hiring. (Kousoulas Decl. Eldaghar Aff. ¶ 49.) Accordingly, the Court finds that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination.

### ii.    The Transfer Denial

The Court finds that the transfer denial occurred under circumstances giving rise to an inference of discrimination. "A showing of disparate treatment -- that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' -- is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." Mandell, 316 F.3d at 379 (2d Cir. 2003) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)). The Court finds that Defendant's disparate treatment of Plaintiff and Lorme gives rise to an inference of discrimination.

13

Plaintiff alleges, and Defendant does not dispute, that
Lorme is of American national origin (see Kousoulas Decl.
Eldaghar Aff. ¶ 51) and was thirty-five years old in 2001 (see
Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 67).  On June 5, 2001,
Defendant transferred Lorme to the DCAS Office of External
Affairs in lieu of termination (see id. ¶¶ 70-72), but Plaintiff
did not receive such an opportunity.  It is undisputed that Fong
recommended Lorme's termination because Lorme was "unable to do
the job that [DCAS] hired him to do."  (Id. ¶ 70.)  Because
Defendant proffers that it terminated Plaintiff due to his poor
work performance, the Court infers that Plaintiff and Lorme were
similarly situated employees.  Accordingly, the Court finds that
the transfer denial occurred under circumstances giving rise to
an inference of discrimination.

### iii. The Restoration Refusals

The Court finds that the restoration refusals did not occur
under circumstances giving rise to an inference of
discrimination.  Although Plaintiff alleges that the restoration
refusals were motivated by retaliatory animus (see Pl.'s Mem.
21), he alleges no facts showing disparate treatment or otherwise
supporting an inference of discrimination with respect to the
restoration refusals.  Plaintiff fails to allege, and the record
does not reflect, that employees who were not of Egyptian
national origin were restored to the civil service list following
termination.  Plaintiff fails to allege, and the record does not

14

reflect, that employees under the age of forty were restored to the civil service list following termination. Indeed, it is undisputed that after Lorme's termination from the DCAS Office of External Affairs, Defendant denied Lorme's request to be restored to the civil service list for Associate City Planners. (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶¶ 74-75.) Plaintiff thus fails to establish disparate treatment with respect to the restoration refusals. See Austin v. Ford Models, Inc., 149 F.3d 148, 154 (2d Cir. 1998). Accordingly, the Court finds that the restoration refusals did not occur under circumstances giving rise to an inference of discrimination. Plaintiff thus fails to establish a prima facie case for the discrimination claim based on the restoration refusals.

Plaintiff satisfies his prima facie case with respect to the discrimination claims based on (1) his termination, and (2) the transfer denial. The Court now turns to the next stage of the discrimination framework.

### 3. Legitimate, Nondiscriminatory Reason

Because Plaintiff satisfies the minimal burden of establishing a prima facie case of discrimination, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination and the transfer denial. "Any stated reason is sufficient; the employer need not persuade the court that the proffered reason was the actual reason for its decision." Tarshis, 211 F.3d at 36 (citations omitted); see also

15

<u>Austin</u>, 149 F.3d at 153. Defendant proffers unsatisfactory job performance as the legitimate, nondiscriminatory reason for its actions (<u>see</u> Def.'s Mem. 3-8), and the Court finds that Defendant thus meets its burden.

Defendant's dissatisfaction with Plaintiff's job performance is well-documented. (<u>See, e.g.</u>, Soni Decl. Exs. L (March 5, 2001 probationary report noting that Plaintiff "had some difficulty understanding the meaning of some of the concepts and processes of Land Use Planning," that Plaintiff "has some weaknesses with computers, which makes it difficult for him to do his job in a timely manner," and that Plaintiff was not punctual); O (memorandum attached to the June 2, 2001 probationary report noting Plaintiff's lack of progress, his "difficulty prioritizing tasks," his "struggle[s] with concepts" and "Microsoft Access, a computer program he has been shown how to use more than once," and his poor punctuality); and V (memorandum attached to the July 2, 2001 probationary report noting no improvement in Plaintiff's work product and specifically pointing to Plaintiff's struggle "with written responses to inquiries made by the general public").) The probationary reports dated June 2, 2001; July 2, 2001; and August 2, 2001 rate Plaintiff's overall job performance as unsatisfactory. (<u>See</u> Pl.'s Resp. to Def.'s 56.1 Stmt. ¶¶ 34, 48, 51; Soni Decl. Exs. O, V, Y.) In addition to these negative probationary reports, memoranda dated June 15, 2001; June 20, 2001; June 22, 2001; and June 26, 2001 further document

Defendant's dissatisfaction with Plaintiff's job performance. (See Soni Decl. Exs. R, S, T, U.)  Significantly, the June 26, 2001 memorandum highlights Plaintiff's difficulty using "the basic resources for all property reviews."  (See id. Ex. U.)

Plaintiff's well-documented lack of progress is a legitimate, business reason for Plaintiff's termination and the transfer denial.  See Slattery, 248 F.3d at 93 (finding that an employer "easily met its burden of demonstrating a legitimate, non-discriminatory reason for its actions" where the employer thoroughly documented its dissatisfaction with the employee's performance).  Accordingly, the Court finds that Defendant articulates a legitimate, nondiscriminatory reason for Plaintiff's termination and the transfer denial.

### 4.    Pretext and Discriminatory Motivation

Because Defendant articulates a legitimate, nondiscriminatory reason for Plaintiff's termination and the transfer denial, "the burden shifts back to [P]laintiff to prove that discrimination was the real reason for the employment action[s]."  Tarshis, 211 F.3d at 36; see also Slattery, 248 F.3d at 91 ("[T]he final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff.").  Plaintiff "may demonstrate that discrimination was the real reason by showing that it was a motivating factor –– although it need not be the only motivating factor."  Tarshis,

17

211 F.3d at 36 (emphasis in original).

Plaintiff raises triable issues regarding (1) the accuracy of some of the information contained in the probationary reports and memoranda; (2) Plaintiff's alleged failure to receive a warning letter and the last two probationary reports; and (3) alleged oral comments related to Plaintiff's age.  Considering collectively these triable issues and Plaintiff's <u>prima facie</u> case, the Court finds genuine issues of material fact regarding pretext and discriminatory motivation.  <u>See</u> <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 151 (2d Cir. 2000) ("In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion . . . for a jury, in assessing whether there was impermissible discrimination and whether the defendant's proffered explanation is a pretext for such discrimination, would be entitled to view the evidence as a whole.")

### a.    Accuracy of Information

The Court finds that Plaintiff raises triable issues regarding the accuracy of some of the information contained in the probationary reports and memoranda, and concludes that these alleged inaccuracies could support a jury finding of pretext and discriminatory motivation.

Plaintiff presents evidence contradicting some of the information contained in and attached to the negative probationary reports.  (<u>See</u> Pl.'s Mem. 6-9.)  For example, in a

memorandum attached to the June 2, 2001 probationary report, Knecht criticized Plaintiff for thinking that the information in IPIS, a computer database, "came from the Department of Finance." (Soni Decl. Ex. O.)  However, Plaintiff cites deposition testimony and documentary evidence showing that the Department of Finance is a source of IPIS data.  (<u>See</u> Pl.'s Mem. 9.)  Plaintiff further contends that, contrary to criticism contained in the probationary reports, (1) he timely completed an April 30, 2001 assignment (<u>see</u> <u>id.</u> at 6; Pl.'s 56.1 Counterstmt. ¶ 74); (2) he timely completed a May 31, 2001 assignment (<u>see</u> Pl.'s Mem. 6-7); and (3) his punctuality improved after his supervisor explained that he was not entitled to a five minute grace period after the start of the work day (<u>see</u> <u>id.</u> at 7; Pl.'s 56.1 Counterstmt. ¶ 49).

The Court notes that Plaintiff does not dispute the accuracy of all of the information underlying the criticism of his job performance, such as the June 26, 2001 memorandum memorializing Plaintiff's difficulties using "the basic resources for all property reviews" (<u>see</u> Soni Decl. Ex. U).  Nevertheless, a jury could reasonably find pretext and discriminatory motivation based on Defendant's reliance on inaccurate information.

### b.   Procedural Deviations

The Court finds that Plaintiff raises triable issues regarding his alleged failure to receive a warning letter and the last two probationary reports, and concludes that these alleged

procedural deviations could support a jury finding of pretext and discriminatory motivation.

"Departures from procedural regularity . . . can raise a question as to the good faith of the process." <u>Stern v. Trustees of Columbia Univ.</u>, 131 F.3d 305, 313 (2d Cir. 1997). Procedural deviations may lead a finder of fact to infer that an employer was "dissembling to cover up a discriminatory purpose." <u>Richards v. Calvet</u>, No. 99 Civ. 12172, 2005 U.S. Dist. LEXIS 5365, at *25 (S.D.N.Y. Mar. 31, 2005) (internal quotation marks and citation omitted).

Plaintiff alleges two procedural deviations from DCAS policy related to his termination. First, the monthly probationary report form states that "[a] warning letter will be sent to the employee if an unsatisfactory rating is given in any one month." (<u>See</u> Soni Decl. Exs. L, M, N, O, V, Y.) Plaintiff alleges that following his receipt of the June 2, 2001 probationary report, in which he received an unsatisfactory rating, he never received such a warning letter. (<u>See</u> Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 28.)

Second, an employee's signature on a probationary report indicates that he "ha[s] had the opportunity to read th[e] probationary report and discuss it with [his] supervisor." (Soni Decl. Exs. L, M, N, O, V, Y.) John testified at her deposition that a probationary report lacking the employee's signature is incomplete and if she received such a probationary report, she

would return it to the employee's supervisor. (<u>See</u> Kousoulas
Decl. Ex. G 5, 105-06.) Unlike the first four probationary
reports, the July 2, 2001 and August 2, 2001 probationary reports
do not include Plaintiff's signature. (<u>Compare</u> Soni Decl. Exs.
L, M, N, O <u>with</u> Soni Decl. Exs. V, Y.) Plaintiff thus presented
evidence that he did not receive the last two probationary
reports. (<u>See</u> Pl.'s Resp. to Def.'s 56.1 Stmt. ¶¶ 49, 50, 52.)

A jury could reasonably find pretext and discriminatory
motivation based on these procedural deviations.

### c.   Oral Comments

The Court finds that Plaintiff raises triable issues
regarding two oral comments related to Plaintiff's age, and
concludes that these alleged oral comments could support a jury
finding of pretext and discriminatory motivation. (<u>See</u> Apr. 11,
2006 Order (finding genuine issues of material fact with respect
to only two of the comments described above in Section I(C)(1)).)

Plaintiff alleges that (1) Knecht and Fong stated that
younger people are better than older people at using computers,
and (2) Knecht allegedly answered a question posed by Plaintiff
with the dismissive response that "even Matthew knows this," a
reference to Berk, who was then a college student intern employed
by DCAS. Plaintiff's supervisors had "substantial influence over
[Plaintiff's] employment." <u>Owens</u>, 934 F.2d at 410 (finding that
statements made by the plaintiff's supervisors relating to the
plaintiff's age, although "not numerous . . . raise[d] a genuine

issue of fact on the issue of pretextuality").

A jury could reasonably find pretext and discriminatory motivation with respect to the age discrimination claims based on these alleged oral comments.

### d. Same Actor Defense

Defendant argues that the same actor defense precludes a finding of pretext and discriminatory motivation. (See Def.'s Mem. 8-9.) This argument is unpersuasive.

The same actor defense states "that when the person who made the decision to fire was the same person who made the decision to hire, especially when the firing occurred only a short time after the hiring, it is difficult to impute to him an invidious firing motivation that would be inconsistent with his decision to hire." Jetter v. Knothe Corp., 324 F.3d 73, 76 (2d Cir. 2003) (citing Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)). It is undisputed that Knecht and Fong decided to hire Plaintiff, and later recommended Plaintiff's termination. (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 10; Soni Decl. Exs. D 45, J 45.) However, "the same actor principle presupposes that the person who hired the plaintiff was aware of the plaintiff's protected characteristic at the time of hiring." Rubel v. Century Bancshares, Inc., No. 02 Civ. 482, 2004 U.S. Dist. LEXIS 893, at *13 (D. Minn. Jan. 8, 2004). Plaintiff presented evidence that at the time of hiring, Knecht and Fong were not

aware of Plaintiff's national origin.[5] (See Kousoulas Decl. Exs. C 24-25, D 12).

Accordingly, the Court finds that the same actor defense cannot shield Defendant from a finding of pretext and discriminatory motivation.[6]

### 5. Summary of the Discrimination Claims

The Court finds that Plaintiff fails to establish a prima facie case of national origin or age discrimination based on the restoration refusals and the disparate scrutiny. The Court thus grants summary judgment to Defendant on these two discrimination claims.

The Court finds that (1) Plaintiff establishes a prima facie case of national origin and age discrimination based on his termination and the transfer denial; (2) Defendant articulates a legitimate, nondiscriminatory reason for its actions; and (3) a jury could reasonably find pretext and discriminatory motivation

---

[5] There is no evidence before the Court regarding Knecht's or Fong's knowledge of Plaintiff's age at the time of hiring.

[6] Plaintiff argues that the same actor defense is inapplicable because "Knecht and Fong may not have had much of a choice in hiring [P]laintiff." (Pl.'s Mem. 17.) Although the Court agrees that the same actor defense has "far less applicability" when there exists a "collateral incentive to hire [a] particular candidate," Jetter, 324 F.3d at 76, the record does not support any such collateral incentive in this case. Plaintiff alleges that at the beginning of his probationary employment, DCAS Deputy Commissioner Lori Fierstein informed Plaintiff that DRES "sought to hire individuals with background [sic] in architecture." (Kousoulas Decl. Eldaghar Aff. ¶ 13.) This allegation, even coupled with Plaintiff's alleged perfect score on the civil service examination, does not support the inference that Knecht and Fong were required to hire Plaintiff.

based on Plaintiff's <u>prima facie</u> case and triable issues

regarding (a) the accuracy of information relied on in

Plaintiff's performance reviews, (b) procedural deviations

surrounding Plaintiff's termination, and (c) two oral comments by

Plaintiff's supervisors related to Plaintiff's age.  Accordingly,

the Court denies summary judgment on these two  discrimination

claims.

**C.   RETALIATION CLAIMS**

Plaintiff claims that Defendant retaliated against him for

complaining about discrimination.  Plaintiff argues that the

following incidents were retaliatory: (1) his termination; (2)

the transfer denial; and (3) the restoration refusals.  (<u>See</u>

Pl.'s Mem. 21-22.)

The Court denies summary judgment on the retaliation claims

based on (1) Plaintiff's termination; (2) the transfer denial;

and (3) the restoration refusals.

**1.   Jurisdiction over the Retaliation Claims**

Defendant argues that the Court lacks jurisdiction over

Plaintiff's retaliation claims based on his termination and the

transfer denial because Plaintiff did not raise these claims in

his SDHR complaint or his EEOC charge.[7]  The Court finds that it

_____

[7] Defendant does not challenge the Court's jurisdiction over the
retaliation claim based on the second restoration refusal, conceding
that the second restoration refusal occurred "<u>after</u> [P]laintiff filed
his claims of discrimination."  (Def.'s Mem. 16 n.10.)

However, Defendant argues that the first restoration refusal
occurred before Plaintiff filed his SDHR complaint but was not raised
in the SDHR complaint, thereby depriving the Court of jurisdiction

24

has jurisdiction over Plaintiff's retaliation claims.

"A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge." Butts v. The City of New York Dep't of Housing Pres. and Dev., 990 F.2d 1397, 1401 (2d Cir. 1993) (internal quotation marks and citations omitted). This exhaustion requirement also applies to ADEA claims. Id.

Defendant argues that Plaintiff failed to satisfy the exhaustion requirement with respect to the retaliation claims based on his termination and the transfer denial, because Plaintiff did not include these claims in his SDHR complaint or his EEOC charge. These claims each arose before Plaintiff served the notice of claim of the SDHR complaint. (See Def.'s Mem. 14-

---

over this claim. The Court sets forth the following chronology: On or about September 21, 2001, Plaintiff served a notice of claim, dated September 17, 2001, on the City of New York. (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 76; Soni Decl. Ex. KK.) A notice of claim is "a copy of a verified complaint" which will "be accepted for filing at the Division of Human Rights thirty days after service" of the notice of claim. (Soni Decl. Ex. KK.) Based on the stamps on the notice of claim, the New York City Law Department received the notice of claim on September 21, 2001, and another city agency received it on September 24, 2001. (Id.) On October 10, 2001, Defendant refused Plaintiff's first restoration request. (See Soni Decl. Eldaghar Aff. Ex. I.) Based on the stamp on the SDHR complaint, the SDHR received the complaint on October 18, 2001.

   Although Plaintiff did not file the SDHR complaint until after the first restoration refusal, Plaintiff served his notice of claim before the first restoration refusal. The Court thus has jurisdiction over the retaliation claim based on the first restoration refusal because the first restoration refusal occurred after Plaintiff initiated his claims of discrimination. (Cf. Soni Decl. John Aff. ¶ 13 (DCAS "only learned of Plaintiff's allegations of discrimination after receiving a copy of [P]laintiff's complaint to the State Division of Human Rights."))

15.)  However, the Court concludes that the retaliation claims
are included in Plaintiff's EEOC charge.  In the SDHR complaint
and the EEOC charge, Plaintiff framed his termination claim and
his transfer denial claim as discrimination claims.[8]  The
retaliation claims based on Plaintiff's termination and the
transfer denial are "based on essentially the same factual
allegations presented in . . . [the] discrimination complaint
that was filed with the [SDHR and the] EEOC."  <u>Owens</u>, 934 F.2d at
410 n.3.  As such, these two retaliation claims concern conduct
that "would fall within the scope of the EEOC investigation which
can reasonably be expected to grow out of [Plaintiff's] charge[s]
of discrimination."  <u>Butts</u>, 990 F.2d at 1402 (internal quotation
marks and citations omitted).

Accordingly, the Court has jurisdiction over Plaintiff's
retaliation claims.

### 2.    Retaliation Framework

Title VII and the ADEA protect against retaliation in the
employment context.  <u>See</u> 42 U.S.C. § 2000e-3(a); 29 U.S.C. §
623(d).  Courts analyze Title VII and ADEA claims of retaliation
under the "burden shifting framework" set forth in <u>McDonnell</u>
<u>Douglas Corp. v. Green</u> and its progeny.  <u>Terry</u>, 336 F.3d at 141.

---

[8] Plaintiff's SDHR complaint claims that Plaintiff was terminated
because of his national origin and age.  (<u>See</u> Soni Decl. Ex. LL.)
Plaintiff's request that the EEOC review the SDHR's determination
states that Plaintiff was denied the opportunity to transfer to
another DCAS unit in lieu of termination because of his national
origin.  (<u>See</u> <u>id.</u> Ex. NN.)

First, a plaintiff must show a _prima facie_ case of retaliation.
_See_ _id._  Second, "[o]nce the plaintiff establishes a _prima facie_
case, the burden of production shifts to the defendant to
articulate some legitimate, nondiscriminatory reason for its
action."  _Sumner v. United States Postal Serv._, 899 F.2d 203, 209
(2d Cir. 1990) (internal quotation marks and citation omitted).
Third, "the burden then shifts back to the plaintiff to
demonstrate that the proffered reason was not the true reason for
the decision, i.e. that the articulated reason is a pretext."
_Id._ (internal quotation marks and citations omitted).

Title VII and the ADEA are "violated when 'a retaliatory
motive plays a part in adverse employment actions toward an
employee, whether or not it was the sole cause.'"  _Terry_, 336
F.3d at 140-41 (quoting _Cosgrove v. Sears, Roebuck & Co._, 9 F.3d
1033, 1039 (2d Cir. 1993)).  Furthermore, "[a] plaintiff need not
prove that her underlying discrimination claim was valid to
establish a retaliation claim."  _Cooper v. Morgenthau_, No. 99
Civ. 11946, 2001 U.S. Dist. LEXIS 10904, at *24 (S.D.N.Y. July
31, 2001) (citation omitted).

### 3.  **Prima Facie Case**

"To establish a _prima facie_ case of retaliation, an employee
must show (1) participation in a protected activity known to the
defendant; (2) an employment action disadvantaging the plaintiff;
and (3) a causal connection between the protected activity and
the adverse employment action."  _Terry_, 336 F.3d at 141 (internal

27

quotation marks and citations omitted).

### a. Protected Activity

It is undisputed that Plaintiff satisfies the first element of his prima facie case with respect to all of the retaliation claims. Plaintiff engaged in three protected activities known to Defendant: (1) Plaintiff complained of discrimination to his supervisor and the DRES Director of Personnel (the "oral complaints of discrimination") (see Apr. 11, 2006 Order 2); (2) Plaintiff served a notice of claim and filed a SDHR complaint; and (3) Plaintiff sought EEOC review of the SDHR determination. (See Def.'s Mem. 14; Pl.'s Mem. 20.)

### b. Adverse Employment Actions

The Court finds that Plaintiff satisfies the second element of his prima facie case with respect to all of the retaliation claims. Plaintiff argues that as a result of retaliation, he suffered three adverse employment actions: (1) his termination; (2) the denial of an opportunity to transfer to another DCAS unit in lieu of termination; and (3) the refusals to restore Plaintiff's name to the civil service list for City Planners. The Court finds that each of these three actions constitutes an adverse employment action. See supra Section II(B)(2)(c).

### c. Causal Connection

A causal connection can be established by (1) temporal proximity between the protected activity and the adverse employment action; (2) "disparate treatment of fellow employees

28

who engaged in similar conduct;" or (3) "retaliatory animus."[9] Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991).

For ease of reviewing the causal connection element, the Court notes the following temporal relationships between the adverse employment actions and Plaintiff's protected activity: (1) his termination and the transfer denial occurred after Plaintiff's oral complaints of discrimination; (2) the first restoration refusal occurred after Plaintiff's oral complaints of discrimination and service of the notice of claim of the SDHR complaint; and (3) the second restoration refusal occurred after Plaintiff's oral complaints of discrimination, service of the notice of claim of the SDHR complaint, and filing of the SDHR complaint. Plaintiff sought EEOC review of the SDHR determination after all of the adverse employment actions had already occurred.

### i. Plaintiff's Termination and the Transfer Denial

The Court finds a causal connection between (1) the oral complaints of discrimination, and (2) Plaintiff's termination and the transfer denial, based on both temporal proximity and retaliatory animus.

First, approximately two months elapsed between the above-referenced protected activity and adverse employment actions.

---

[9] In the context of the retaliation claims, Plaintiff does not allege, and the record does not reveal, any instances of disparate treatment.

The Court finds that a span of two months establishes a weak causal connection. See Woods v. Enlarged City Sch. Dist. of Newburgh, 473 F. Supp. 2d 498, 529 (S.D.N.Y. 2007) (collecting cases); see also Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001) (finding no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship").

Second, Plaintiff did not receive a warning letter or the last two probationary reports prior to his termination. See supra Section II(B)(4)(b). These procedural deviations support an inference of retaliatory animus. See Stern, 131 F.3d at 313 (finding that "[d]epartures from procedural regularity . . . can raise a question as to the good faith of the process").

Accordingly, the Court finds a causal connection between (1) the oral complaints of discrimination, and (2) Plaintiff's termination and the transfer denial.

### ii. The Restoration Refusals

The Court finds a causal connection between (1) service of the notice of claim and the first restoration refusal, and (2)(a) service of the notice of claim and filing of the SDHR complaint and (b) the second restoration refusal, based on temporal proximity.[10]

---

[10] Plaintiff argues that procedural deviations related to the restoration refusals give rise to an inference of retaliatory animus. The Court finds that Plaintiff's arguments lack merit, and therefore does not rely on retaliatory animus to find a causal connection in the

Less than one month elapsed between Plaintiff's service of the notice of claim of the SDHR complaint and the first restoration refusal. <u>See</u> <u>supra</u> note 7. Accordingly, the Court finds a causal connection between service of the notice of claim and the first restoration refusal. <u>See</u> <u>Woods</u>, 473 F. Supp. 2d at 529.

Approximately seven months elapsed between Plaintiff's service of the notice of claim and the second restoration refusal, and approximately six months elapsed between Plaintiff's filing of the SDHR complaint and the second restoration refusal. Ordinarily such long periods of time would indicate the absence of a causal connection. <u>See</u> <u>Woods</u>, 473 F. Supp. 2d at 529. However, in this case, the Court finds a causal connection because Defendant had no opportunity to retaliate against

---

context of the restoration refusals.
 First, Plaintiff argues that the restoration refusals were made by the DCAS Director of Personnel, Jeffrey Ketterer ("Ketterer"), and not, as required by DCAS Order Number 18, by the Deputy Commissioner for Citywide Personnel Services. (<u>See</u> Pl.'s Mem. 24.) Plaintiff relies on Exhibit 24 attached to his Affidavit (<u>see</u> Kousoulas Decl. Eldaghar Aff. Ex. 24) to support his allegation that Ketterer made the restoration refusals. Plaintiff's reliance is misplaced. Exhibit 24 is merely an information request completed by Ketterer at the behest of the Deputy Commissioner. The Court finds that Ketterer completed the information request on October 5, 2001. However, DCAS did not refuse the first restoration request until October 10, 2001. (<u>See</u> Soni Decl. Compl. Ex. I.) The Court thus finds Plaintiff's first argument to be unsupported by the evidence in the record.
 Second, Plaintiff argues that Defendant's explanation for the first restoration refusal is contested and Defendant failed to offer any explanation for the second restoration refusal. (<u>See</u> Pl.'s Mem. 24-25.) Plaintiff points to no policy or procedure requiring an explanation for a restoration refusal. The Court thus finds that Plaintiff's second argument does not establish a procedural deviation giving rise to an inference of retaliatory animus.

31

Plaintiff until the second restoration request.  See <u>Bernhardt v.</u>
<u>Interbank of New York</u>, 18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998)
(finding that although the passage of eleven months "would
suggest strongly the absence of a causal link," such a conclusion
was not required because no retaliatory action could have been
taken during that span of time).

Accordingly, the Court finds a causal connection between (1)
service of the notice of claim and the filing of the SDHR
complaint, and (2) the second restoration refusal.

The Court therefore finds that Plaintiff satisfies the third
element of his <u>prima facie</u> case with respect to all of the
retaliation claims.  Plaintiff thus satisfies his <u>prima facie</u>
case with respect to the retaliation claims based on (1) his
termination; (2) the transfer denial; and (3) the restoration
refusals.

### 4. Legitimate, Nondiscriminatory Reason

Defendant proffers unsatisfactory job performance as the
legitimate, nondiscriminatory reason for (1) Plaintiff's
termination; (2) the transfer denial; and (3) the restoration
refusals.  (<u>See</u> Def.'s Mem. 17-18.)  The Court finds that
Defendant's explanation meets the burden of articulating a
legitimate, nondiscriminatory reason for the adverse employment
actions taken against Plaintiff.  <u>See</u> <u>supra</u> Section II(B)(3).

### 5. Pretext and Retaliatory Motivation

Plaintiff may establish pretext "either directly by

32

persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981). Defendant alleges that "Plaintiff was denied restoration because his probationary performance was unsatisfactory and led to his termination." (Def.'s Mem. 17.) Plaintiff seeks to establish pretext indirectly, by showing that this "explanation is unworthy of credence." (<u>See</u> Pl.'s Mem. 25.)

Plaintiff raises triable issues regarding the accuracy of some of the information contained in the probationary reports and memoranda documenting Plaintiff's allegedly unsatisfactory job performance. <u>See</u> <u>supra</u> Section II(B)(4)(a). Plaintiff also raises triable issues regarding his alleged failure to receive a warning letter and the last two probationary reports. <u>See</u> <u>supra</u> Section II(B)(4)(b).[11]

Considering collectively these triable issues and Plaintiff's <u>prima facie</u> case, the Court finds genuine issues of material fact regarding pretext and retaliatory motivation.

### 6. Summary of the Retaliation Claims

The Court finds that (1) Plaintiff establishes a <u>prima facie</u> case of retaliation with respect to all of the retaliation

---

[11] The Court notes that these procedural deviations did not affect the restoration refusals. The Court further notes that Plaintiff does not raise any other procedural deviations giving rise to an inference of retaliatory motivation in the context of the restoration refusals. <u>See</u> <u>supra</u> note 10.

claims; (2) Defendant articulates a legitimate, nondiscriminatory reason for its actions; and (3) a jury could reasonably find pretext and retaliatory motivation based on Plaintiff's prima facie case and triable issues regarding (a) the accuracy of information relied on in Plaintiff's performance reviews, and (b) procedural deviations surrounding Plaintiff's termination. Accordingly, the Court denies summary judgment on the retaliation claims based on (1) Plaintiff's termination; (2) the transfer denial; and (3) the restoration refusals.

### D.    HOSTILE WORK ENVIRONMENT CLAIM

Plaintiff claims hostile work environment based on (1) alleged oral comments made by his supervisors, and (2) other conduct.  After considering Plaintiff's allegations individually and collectively, the Court grants summary judgment to Defendant on the hostile work environment claim.

#### 1.    Hostile Work Environment Framework

To prevail on a hostile work environment claim, a plaintiff must establish that "(1) his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."[12]  Schwapp v.

---

[12] The second element of Plaintiff's hostile work environment claim is not in dispute.  "[A]n employer is presumed to bear absolute liability in cases where . . . the harassment is perpetrated by the victim's supervisor."  Terry, 336 F.3d at 148 n.20.  Plaintiff maintains that Knecht, Plaintiff's direct supervisor, and Fong,

<u>Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citation omitted).  "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive."  <u>Alfano v. Costello</u>, 294 F.3d 365, 374 (2d Cir. 2002)(quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).

In deciding whether a work environment was objectively hostile or abusive, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse."  <u>Alfano</u>, 294 F.3d at 374.  "Among the factors to consider when determining whether an environment is sufficiently hostile are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  <u>Terry</u>, 336 F.3d at 148 (quoting <u>Harris</u>, 510 U.S. at 23).  This standard applies to hostile work environment claims brought under Title VII and the ADEA.  <u>Id.</u> at 147-48.

## 2.  Alleged Oral Comments

To support his hostile work environment claim, Plaintiff

---

Knecht's direct supervisor, are responsible for the relevant discriminatory conduct.  Defendant does not offer an affirmative defense to rebut the ensuing presumption.  The Court thus finds that Plaintiff shows a specific basis for imputing the conduct to Defendant.

contends that "he was subjected to unwarranted reprimands and incidents of shouting by his supervisors . . . [and was] belittled, undermined and asked condescending rhetorical questions." (Def.'s Mem. 19.) Plaintiff cites the six oral comments described above in Section I(C)(1).

Assuming arguendo that a jury could reasonably find that all six oral comments were driven by Plaintiff's national origin or age, such "[i]solated incidents or episodic conduct will not support a hostile work environment claim." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999) (finding a hostile work environment where the plaintiff's supervisor and co-workers repeatedly used racial slurs and other derogatory terms to refer to the plaintiff and other African-Americans); compare Alfano, 294 F.3d at 376-81 (finding that twelve incidents cited by the plaintiff and considered in the aggregate, fell below the hostile work environment threshold) (collecting cases) with Terry, 336 F.3d at 149 (finding a hostile work environment where a co-worker testified at her deposition that the plaintiff's supervisors "purposefully harassed [the plaintiff] and made his work environment unusually and unnecessarily unpleasant on a nearly daily basis").

Accordingly, the Court finds that the six oral comments alleged by Plaintiff do not rise to the level of severity or pervasiveness required to create an objectively hostile work environment.

### 3. Other Conduct

Plaintiff also argues that he faced a hostile work environment because (1) "he was denied the same training offered to his younger, American colleagues" and "his work was subjected to greater scrutiny than his peers;" (2) he was "refused assignments;" (3) "he was not provided with the opportunity to transfer within DCAS in lieu of termination;" (4) "he received unwarranted criticism in his performance evaluations;" and (5) "he was removed from projects and replaced by his younger peer." (Pl.'s Mem. 19.)

The Court finds that (1) the alleged disparate training and scrutiny; (2) the alleged assignment refusals; (3) the transfer denial; and (4) the allegedly unwarranted criticism, excluding any criticism contained in the June 2, 2001 probationary report, are not evidence of a hostile work environment. The Court further finds that (1) the allegedly unwarranted criticism contained in the June 2, 2001 probationary report; and (2) the single incident in which Defendant replaced Plaintiff on a project do not rise to the level of severity or pervasiveness required to create an objectively hostile work environment.

### a. Alleged Disparate Training and Scrutiny

First, the alleged levels of training and scrutiny received by Plaintiff are not evidence of a hostile work environment because Plaintiff failed to demonstrate that this treatment was

motivated by discrimination.  Neither the training nor the
scrutiny facially were motivated by Plaintiff's national origin
or age.  Furthermore, Plaintiff failed to establish "some
circumstantial or other basis for inferring that incidents
[neutral] on their face were in fact discriminatory."  Alfano,
294 F.3d at 378.

Plaintiff argues that the Court can infer that the alleged
levels of training and scrutiny were motivated by discrimination
because he was treated differently than similarly situated co-
workers.  He compares the training and scrutiny he received to
the training and scrutiny received by Christian Grove ("Grove"),
a younger City Planner of American national origin.  (See
Kousoulas Decl. Eldaghar Aff. ¶¶ 27, 28.)  However, Plaintiff
fails to present evidence that he and Grove were "similarly
situated in all material respects."  Mandell, 316 F.3d at 379
(quoting Graham, 230 F.3d at 39).  Rather, the evidence in the
record reveals that Plaintiff's supervisors considered Grove's
skill set to be more advanced than Plaintiff's skill set.  (See,
e.g., Soni Decl. Exs. Q (referring to Grove who "already
understood how to do certain things that [Plaintiff] was still
struggling with"), U (memorializing Grove's greater proficiency
with and understanding of the "tools [that] are the basic
resources for all property reviews")).

Accordingly, the Court finds that the alleged disparate

levels of training and scrutiny are not evidence of a hostile work environment.  See Alfano, 294 F.3d at 377 ("It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals.")

### b.    Alleged Assignment Refusals

Second, Plaintiff's allegation that he was "assigned very few projects" in August 2001 is not evidence of a hostile work environment.  (See Kousoulas Decl. Eldaghar Aff. ¶ 44.) Defendant terminated Plaintiff's employment on August 17, 2001. A dearth of assignments during such a brief period is not evidence of a hostile work environment.

### c.    The Transfer Denial

Third, the transfer denial is not evidence of a hostile work environment because it did not occur during the course of Plaintiff's employment.  Plaintiff never requested a transfer in lieu of termination.  (See Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 70.)  Plaintiff's termination was effective the day on which he received notice of his termination.  (See id. ¶ 60.)  The transfer denial thus did not affect Plaintiff until after his termination.  Accordingly, the Court finds that the transfer denial is not evidence of a hostile work environment.

### d.   Allegedly Unwarranted Criticism

Fourth, the allegedly unwarranted criticism, excluding any criticism contained in the June 2, 2001 probationary report, is not evidence of a hostile work environment.  Furthermore, any criticism contained in the June 2, 2001 probationary report does not rise to the level of severity or pervasiveness required to create an objectively hostile work environment.

It is undisputed that the March 5, 2001; April 5, 2001; and May 2, 2001 probationary reports rated Plaintiff's job performance as satisfactory.  Thus, these reports, and the information contained therein, "support no inference of mistreatment."  Alfano, 294 F.3d at 376 (finding that "'good' evaluations (rather than 'excellent' [evaluations]) did not result in "disadvantage or adverse effect on [the plaintiff's] job performance").  It is further undisputed that Plaintiff did not receive the July 2, 2001 and August 2, 2001 probationary reports until after the termination of his employment.  The Court thus finds that any criticism contained in these probationary reports is not evidence of a hostile work environment.

Although Plaintiff received the June 2, 2001 probationary report during the course of his employment and it rated Plaintiff's overall job performance as unsatisfactory, (1) Plaintiff does not dispute the accuracy of the majority of information contained in the attached memorandum, (2) Plaintiff's

supervisor twice adjusted the report to address Plaintiff's concerns (see Soni Decl. Ex. B 69-70), and (3) Plaintiff was offered an opportunity to submit a rebuttal to the report (see Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 35).  Accordingly, the Court finds that the allegedly "unwarranted criticism" does not rise to the level of severity or pervasiveness required to create an objectively hostile work environment.

### e.  Alleged Removal from Projects

Fifth, Plaintiff's allegation that "he was removed from projects and replaced by his younger peer" does not rise to the level of severity or pervasiveness required to create an objectively hostile work environment.  The only example Plaintiff cites in support of this allegation is Grove's designation as the "lead speaker or the lead person" for a hearing related to an assignment on which Plaintiff had been working.  (Soni Decl. Ex. B 109-10.)  Plaintiff alleges no other instances in which he was replaced on a project by a younger co-worker.  This single incident does not rise to the level of severity or pervasiveness required to create an objectively hostile work environment.

### 4.  Summary of Hostile Work Environment Claim

The Court finds that several of Plaintiff's allegations are not evidence of a hostile work environment.  Plaintiff's remaining allegations, considered both individually and collectively, do not rise to the level of severity or

pervasiveness required to create an objectively hostile work environment.  The Court thus grants summary judgment to Defendant on the hostile work environment claim.

## III. <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for summary judgment is granted in part and denied in part.

**Discrimination Claims** – The Court grants summary judgment to Defendant with respect to the discrimination claims based on (1) the restoration refusals, and (2) the disparate scrutiny.  The Court denies summary judgment with respect to the discrimination claims based on (1) Plaintiff's termination, and (2) the transfer denial.

**Retaliation Claims** – The Court denies summary judgment to Defendant with respect to the retaliation claims based on (1) Plaintiff's termination; (2) the transfer denial; and (3) the restoration refusals.

**Hostile Work Environment Claim** – The Court grants summary judgment to Defendant with respect to the hostile work environment claim.

With respect to the remaining claims, the parties shall file a Joint Pretrial Order pursuant to the Court's Individual Practices no later than September 2, 2008.

This case is deemed Ready for Trial September 2, 2008.[13]

    SO ORDERED.

Dated:    New York, New York
          July 30, 2008

                              Kimba M. Wood

                              Kimba M. Wood
                              United States District Judge

---

[13] At any time after the Ready Trial Date, the Court may call the parties to trial upon forty-eight hours notice. No adjournment of that trial date will be permitted, unless counsel has faxed to chambers an affidavit stating that he or she is engaged in trial in another court. This affidavit shall include: (1) the caption of the other case, including its index number; (2) the expected length of the trial; (3) the court in which the other case is to be tried; and (4) the name and telephone number of the judge presiding over the case. Counsel shall notify the Court and all other counsel in writing, at the earliest possible time, of any particular scheduling problems involving out-of-town witnesses or other exigencies.